# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

### FEBRUARY TERM, 1877.

THEODORE RUNYON, ESQ., ORDINARY.

CUMMINS O. HARRIS and others, appellants,

and

PHEBE C. BETSON, respondent.

1. A testatrix, seventy years old, having made her will a few days after a paralytic attack, the will was sustained, where she was able to recognize her attendants, and also visitors; knew of the existence of a former will, and expressed anxiety lest she should die before she could make a new one; conversed and consulted intelligently in regard to the second will just before it was drawn, and, when it was read and explained to her, expressed her satisfaction with it. *Held*, with other things, sufficient proof of capacity.

2. The charge of undue influence held not to be sustained.

In the matter of the will of Rachel Dyer, deceased, late of the county of Sussex. On appeal from the decree of

NOTE.—The case of *Banks* v. *Goodfellow*, 5 *L. R.* ( *Q. B.*) 549, decides that a partial unsoundness, not affecting the general faculties, and not operating on the mind of the testator in regard to testamentary disposition, is not sufficient to render a person incapable of disposing of his property by will. This case is founded upon and approves several of

Harris *v.* Betson.

the orphans' court of that county, refusing to admit that will to probate.

*Mr. E. C. Harris* and *Mr. J. R. Emery,* for appellants.

*Mr. L. Van Blarcom* and *Mr. Johnson,* for respondent.

The Ordinary.

The will in question was executed by Rachel Dyer, at the house of Mahala Willett, in Johnsonburgh, in the county of Warren, on the 19th of December, 1874. She died on the 14th of March, 1876. The attesting witnesses to the instrument were Robert Blair and Jonathan T. Willett. On proof according to law, the surrogate of the county of Sussex admitted the will to probate, on the 25th of March, 1876. Phebe C. Betson, one of the next of kin and heirs-at-law of the testatrix, appealed to the orphans' court of the county, and, after a trial, that court decreed that the instrument was not the will of Rachel Dyer, and that the probate granted by the surrogate be cancelled. The testatrix was a single woman, and was about seventy years old at the time of her death. She had no relations nearer than the children of her deceased brother, Josiah Dyer. In 1865 she executed a will, drawn by Mr. Cummins O. Harris, then her agent

the earlier New Jersey decisions. See pp. 566–568. In *Stackhouse* v. *Horton,* 2 *McCart.* 202, Chancellor Green decided that a monomaniac, under certain circumstances, might make a valid will, and that although a testator might be under such a delusion toward a particular person as deprived him of the testator's bounty, yet probate of such will would not be refused, unless by doing so such person would be benefited. Strong resentment against a son-in-law and his family, embittered and kept up by disputes and litigation, does not constitute mental incapacity, if not founded on delusion. *Den. Trumbull* v. *Gibbons,* 2 *Zab.* 117. Unreasonableness of testator's prejudice or unfairness in the disposition of his property, will not, of themselves alone, induce the court to repudiate his will. *Gleespin's Case,* 11 *C. E. Gr.* 523. Unnaturalness, in not making provision for his wife, will not invalidate a will, where it appears that she was cruel to the testator, drove him from the house, and took away papers, notes, &c., surreptitiously. *Wintermute's Case,* 12 *C. E. Gr.* 447. Statements made as a witness nine months after the will was executed, and when enfeebled by sickness,

Harris v. Betson.

for the transaction of her business affairs, by which she gave her property to those children, in equal shares, except some tea-spoons and a woolen coverlet; the former of which she gave to one of those children, and the latter to another. The executors were Mr. Harris and her cousin, Joseph E. Dyer. On the 27th of January, 1874, she took her business out of the hands of Mr. Harris, and entrusted it to Mr. D. S. Anderson, of Newton. Afterwards, and while her papers were still in the hands of Mr. Anderson, she executed a codicil, by which she substituted him as executor in the place of those appointed by the will. About the 12th of December following, she sent a message to Mr. Harris, with a request that he would call and see her. He did not comply, and she again sent for him. He again declined, but, after a third request, went to see her at Mrs. Willett's house, where she was then boarding. At the interview which then took place between them, she requested him to take charge of her affairs again. It appears that Mr. Anderson had voluntarily signified a willingness to be relieved of the charge of her business. Mr. Harris took the matter under consideration for a day or two, and then consented. She then signed an order on Mr. Anderson for the delivery of her papers to Mr. Harris, and at that time

---

although incorrect, are no proof of testator's incapacity when the will was made. *Ibid.*

Influence acquired over a testator by kind offices or persuasion, unconnected with fraud, will not invalidate a will induced by it. *Den. Trumbull* v. *Gibbons*, 2 *Zab.* 117 ; *Lowe* v. *Williamson*, 1 *Gr. Ch.* 82 ; *Glees-pin's Case*, 11 *C. E. Gr.* 523. Whatever destroys a testator's free agency, constitutes undue influence, whether effected by physical force or mental coercion, by threats or by importunity, or by misrepresentation. *Moore* v. *Blauvelt*, 2 *McCart.* 367 ; *Lynch* v. *Clements*, 9 *C. E. Gr.* 431. Such influence will vitiate a will not only as to the person by whom it is procured, but as to all others who would be benefited by the undue influence. *Turner* v. *Cheesman*, 2 *McCart.* 243. The omission of any provision for a child, although not sufficient of itself to establish incapacity, yet, if not satisfactorily accounted for, is entitled to great consideration, if there is any evidence of a fraudulent procurement of the will, or if the will was made by the testator, *in extremis*, in favor of those around him. *Goble* v. *Grant*, 2 *Gr. Ch.* 629. Undue influence is not a presumption, but a conclusion. *Humphrey's Case*, 11 *C. E. Gr.* 513, 12 *C. E. Gr.* 567. See *Alexander's Case*, 12 *C. E. Gr.* 463.—Rep.

told him that she wanted to make a new will, and wanted him to write it for her. She said she meant to alter her will; and to his question as to what alterations she wished to make, she replied, " I want to fix it so those children can't spend it." She then requested him to ask Robert Blair to call and see her. A few days afterwards Mr. Blair went to see her accordingly, accompanied by Mr. Harris. At the interview which then took place, she, as Mr. Blair testifies in his direct examination, began to talk to him about making her will, and said she " wanted it so the children could not spend it." He says that she gave as her reason, in that conversation, that the oldest son had spent his property; and he adds, that after a short conversation, they (Mr. Harris and he and the testatrix were the only persons present) made the " arrangement that the property should be entailed." On his cross-examination he states the conversation with more particularity. He says : " At our first interview, at Rachel's house, she said: ' I am going to make a will and have my property entailed;' that she did not want the children to spend it. I don't remember whether she asked me whether she could do it or not. I told her she could do so if she wished. She then spoke that Josiah was spending his money, and she wanted it fixed so he could not spend it. She said she wanted the children to have the interest paid to them annually so long as they lived."

On the 18th of December Mr. Harris went to see her, and took with him the old will and codicil. He did not show them to her, but told her that he had them with him. On the next day, between seven and eight o'clock in the evening, he went to see her again, and took with him the new will which he had prepared. She requested him to get Mr. Blair and Jonathan T. Willett to witness her execution of it, and he did so. Before she signed it the will was read over to her by Mr. Harris, and explained in the course of the evening. Mr. Blair says that " when Mr. Harris came to the entailments of the property, Mr. Harris asked her if that was right; she said it was as she wanted it, so that the

children could not spend the money; one reason she gave was that the oldest son of her brother had got his money from his father's estate, about one thousand dollars, I think, and had spent it all in one year." Both the subscribing witnesses testify to her competency. When she signed the will she declared that it was her last will. The legal requisites of the execution were all complied with. After the will was executed, Mr. Harris produced the old one, and asked her what he should do with it, and she directed him to burn it, which was then and there done.

In opposition to the will, it is insisted that the testatrix was not, at the time of executing it, of sound and disposing mind, memory and understanding, and that if that be not so absolutely, it was so to such an extent as to render her a ready subject for the influence of Mr. Harris over her, which was successfully exerted, to induce her to give to her nephews and nieces the use for life only of their shares of her property, instead of the shares themselves, as she had done in the will of 1866.

To consider these propositions in their inverse order. I have looked in vain through the testimony for evidence of influence on the part of Mr. Harris. There is absolutely none whatever. He appears to have been unwilling to resume the charge of the business of the testatrix, and, as before remarked, she was compelled to send for him three times before he would call and see her. In the conversation between her and him, before referred to as having taken place a few days before the will was executed, he, as Mr. Blair testifies, said nothing about the will and took no part in the conversation about it. When he was sent for to come and see her, as before mentioned, he persistently declined to go. Jonathan T. Willett testifies that she sent for Mr. Harris before he called; that she told the witness to tell him to come, that she wanted to see him. He adds: " A few days after she came to our place, she wanted some money; she wanted me to come to Newton to see Mr. Anderson, to get some money for her; I came to Newton,

and got some money for her of Mr. Anderson; I told Miss
Dyer that Mr. Anderson said she was so far off that it was
immaterial to him whether he did her business or not; she
then said, ' The next time you see Harris, tell him I want to
see him;' I did tell Mr. Harris what she said; he did not
come; she afterwards asked me if I told Mr. Harris; I told
her I did; she then said, ' The next time you see Mr. Harris,
tell him again,' which I did; he then came; he came about
one week before the will was executed, in response to the last
request." It appears, by the testimony of Mrs. Willett,
that after the will was executed the testatrix would send for
Mr. Harris to come and see her; that he would come two
or three times during the week, and that if he did not come,
she would ask why he did not come and would send for
him. This witness further says, that she was present on
occasions when Mr. Harris would be there to see the testa-
trix, and that he never requested her to leave the room.

Charlotte Willett, daughter of the last mentioned witness,
testifies that before he first came to see the testatrix, at
Mrs. Willett's house, she heard her talking about sending
for him; that the witness and her mother suggested to the
testatrix to send for him; that the testatrix said she would
have to have some one to attend to her business, as she was
going to take it out of Mr. Anderson's hands, and the wit-
ness told her she had better choose Mr. Harris a second
time, as he had done the business before. This witness
further says : " Before I suggested that Mr. Harris should
be sent for, she had spoken to my mother and myself about
making a will; this conversation was a week or ten days
after the stroke of paralysis. She said, 'I guess I will have
a will; I am afraid I am going to die.' I said, 'Rachel,
havn't you got a will?' She said, 'Mr. Blair says that is
getting mouldy, and he is afraid it can't be read good. I
am afraid these poor children will be cheated out of their
money.' She said Mr. Blair had told her the old will was
mouldy, at one time in his store, when she was well. I
often talked to her about Mr. Harris doing her business,

and would mention about Elwood's being a lawyer in New-ark. She would often, when I would talk to her about him, ask where he lived. I have heard Rachel speak about her making a will once or twice after the first conversation about having a will made, until it was made. She said nothing more about making a will, except she wished we would hurry and get some one to make it, for she was afraid she would die."

In this connection, it may be remarked that Mr. Blair testifies that he had had the old will; that he does not think he ever told the testatrix that he thought she had better have a new will drawn, but thinks he did tell Mr. Harris, several years before the new will was drawn, that the old will had become mouldy, and perhaps she had better have a new one drawn.

Dr. Rorback testifies that she stated to him that she wanted him to come and visit her every day; that she did not begrudge him and Mr. Harris their pay, and went on to say that as long as she lived she meant to have what she wanted; that she then went on with a conversation with some others, while he was putting up medicine, to which he did not pay particular attention, and some of which he did not hear; and that he heard her say, during that con-versation, that her property was to go (as he inferred, after her death,) to those poor children. He further says he has heard her, on two or three occasions, say her property was to go to those poor children. He adds: " She said she wanted me and Dr. Harris to come every day;· she did not begrudge our pay." He further says that she gave the title of doctor to Mr. Harris as a joke, because he, the witness, had joked her about " Dr. Harris " being called in consul-tation. As before remarked, the evidence discloses no proof of any influence, on the part of Mr. Harris, over the testatrix, in reference to the will in question.

Nor does the testimony show incapacity. The testatrix came to the house of Mrs. Willett to board about the 1st of December, 1874, and remained there until the last of March

or first of April following. She herself applied to Mrs. Willett for board, and made the agreement with her. By it she was to pay twenty shillings a week for her board. The third day after she arrived at the house she was stricken with paralysis, which affected her entire left side. The will was made in about two weeks after this attack of illness. In opposition to the will, it is urged that that affection destroyed her mental powers almost completely; that she was thereafter unable to recognize her acquaintances, and even her attendant physician, and that she was subject to hallucinations. Dr. Rorback, the young physician before referred to, who attended her from the 4th of December, 1874, to the time of her death, says her mind was very much enfeebled; that, as a general thing, all her mental faculties were somewhat impaired, some slightly and some considerably, denoted by impaired volition or power of will, indicated by a want of power to control the thoughts and emotions, shown by a want of power to carry on a connected train of thought or conversation for any considerable length of time on one subject. " This," he adds, " was generally the case." He further says, that her memory was so impaired that, as a rule, she would never recognize him when he first spoke to her, but there were times when she would. He says, from what he saw, he would think she had not power to comprehend the amount or extent of her property, for the first month of her sickness. He says, however, that there was an improvement in her condition within a week from the time when she was first attacked with paralysis, a change " from active to passive dementia." On cross-examination, he says, however, that there were times when she would recognize him, but the rule was, she would not; that she would always know who he was when she was told; that she would not forget that visit; that after his first visit she would call him " doctor," not use his name; that he thinks she has used his name, but he is not certain; that he means by " devoid of reasoning power," that she was incapable of comparison, carrying on a con-

nected-train of thought to a logical conclusion, and that she very often seemed to lack common sense, but not always. And here it may be remarked, that the conversation before stated, as testified to by this witness, shows that she not only knew him, but that she knew the importance of his services, and so valued them, and the visits of Mr. Harris, that she desired to secure them, regardless of the cost. Besides, she then spoke of the children. And again, it appears that the doctor would joke with her. The opinion of a medical witness, in such a case as this, must, like that of any other, be brought to the test of facts, and it will stand or fall, accordingly. In the first place, then, it is clear, from the testimony of all the witnesses who speak on the subject, that the testatrix, at all times, recognized those who attended upon her.

Mrs. Willett says: "I do not know of any neighbor coming in, and Rachel looking at them, and they speaking to her, and she not knowing them." Mrs. Miller, with whom she lived after she left Mrs. Willett's, says: "I do not remember that she ever failed to recognize Mr. Harris." Charlotte Willett says: "I supposed she knew every one after they would speak to her." Mrs. Hayes, who went to see her immediately after the holidays, in 1874-5, while she was at Mrs. Willett's, says she knew her. Miss Lizzie Blair called on her at Mrs. Willett's, after the stroke of paralysis, every two or three weeks, and sometimes oftener. She says she always knew her when she went in in the daytime. She knew Mrs. Harris when she called on her at Mrs. Willett's. She knew Mr. Blair, for whom she sent, and with whom she conversed, as before mentioned. Jonathan T. Willett says, when he would return home, after being absent, she would inquire of him the prices he had received for grain, &c., and he therefore judged her to be competent to make a will.

Mrs. Miller visited her at Mrs. Willett's, and says that she recognized her. She further says, that when she was boarding at her house, where she lived from May 14th,

1875, until her death, she always knew her. It is very evident, from all the testimony, that at the time when she executed the will she was not only capable of recognizing, but actually did recognize, not only those who were usually about her, but also other persons. Though her cousin, Joseph E. Dyer, testifies that he saw her a couple of times while she was at Mrs. Willett's, and that she did not recognize him until she was informed who he was, and he thought she did not know him, yet he held a conversation with her in regard to both her physical and spiritual condition, in which she answered his questions intelligently. And, besides, she made inquiries of him in regard to his family, which showed that she retained her memory. There is no reason to doubt that when the will was made she had testamentary capacity. She knew of the existence of her former will and she desired to make an alteration in its provisions. She exhibited and expressed anxiety lest she should die before she could make a new will. She sent for Mr. Harris to draw the will, and for Mr. Blair in order that she might consult with him in reference to it before the will should be drawn. She consulted intelligently with Mr. Blair on the subject. When the will had been drawn and was read and explained to her, she listened to it and expressed her satisfaction with it. She designated the persons whom she desired for witnesses, and in their presence she signed it, declaring that it was her last will and testament. She subsequently referred to the disposition she had made of her property by the will, saying, "I've got it fixed now so they" (meaning her brother Josiah's children) "cannot spend it." She gave to Mr. Harris the names of her brother Josiah's children, in order that he might insert them in the will. Either at the time of making the will or subsequently, she informed him where the articles, which she had bequeathed specifically, would be found. On the 13th of December, eleven days after the day on which the will was executed, she made affidavit to a claim for presentation to an administrator, and on the 27th day

Harris *v.* Betson.

of January following, made another like affidavit for presentation to an assignee in insolvency.

After the execution of the will, she exhibited interest in her property and investments. It is clear that she possessed testamentary capacity when the will was made. The objection is made, on behalf of the respondent, that the testatrix could not have comprehended some of the language of the will. But it is evident that she understood the provisions of the instrument. It is proved that about the latter part of April or the first of ·May, 1875, she said to Mr. Harris (she had then left Mrs. Willett's and was living in her own house): "I understand that my will gives these children the use of my property, but they can't spend the principal;" and that while she was at Mrs. Miller's she frequently said: "I have fixed my property so they cannot spend it." It is obvious that the fact that the language employed in the instrument is the language of the scrivener, is no ground of objection to the will. The will was drawn in conformity with the intentions of the testatrix, and makes the disposition of her property which she meant to make. The hallucinations of which Dr. Rorback speaks, were not manifested after the first four or five days after the attack of paralysis. Those of which Corintha Dyer and Mrs. Miller speak, were exhibited after the making of the will, when the testatrix was boarding at Mrs. Miller's.

It is not claimed that any of these alleged delusions had any influence upon her in her disposition of her property. Nor were they sufficient, under the evidence, to indicate a want of testamentary capacity. Moreover, long after the will was executed, and while she was at Mrs. Miller's, she was evidently in possession of her mental faculties. Mrs. Miller says that on one occasion, when she and the testatrix were riding in a carriage with Mr. Harris, they called at Mrs. Freeman's, and while they were there Mrs. Freeman told the testatrix that Dutch Anthony, a man who had lived with the testatrix, had called on her and got from her a looking-glass that belonged to the testatrix. She says that

the testatrix seemed to be provoked about it, and replied that Mrs. Freeman ought not to have let him have it. She further says, that when they were in front of the testatrix's house, in the carriage, the latter spoke about a wardrobe she had left there, and requested Mrs. Harris to look in her house and see if it was there. It is quite evident from her testimony that Mrs. Miller, while the testatrix was at her house, used to talk to her about her household goods. While she was at Mrs. Miller's, the testatrix requested Mr. Harris to write to Jackson Lee and his wife, urging them to come and see her, and saying to them that a young man who was paying his addresses to her niece, Clorinda (or Corintha), was a spendthrift, and unworthy of her. She said she wanted them to come down and see her and her niece, to see if they could not persuade the latter to abandon the idea of marrying him. Clorinda was one of the children of her brother Josiah. She had some property of her own. The testatrix said that the young man just referred to could not spend her property, but he might spend Clorinda's. I am satisfied, from the evidence, that the instrument in question is the will of Rachel Dyer. The decree of the orphans' court will be reversed, except as to costs and counsel fee allowed to the respondent, in addition to which the costs of the appellants in the court below and in this court (including the cost of printing the testimony), and a counsel fee of three hundred dollars to the appellants for the trial below, and a counsel fee of two hundred dollars to the counsel of each side in this court, will be paid out of the estate.